IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JEFFREY SCOTT HAMPTON           )
                                )
v.                              )     No. 3:14-1963
                                )     Judge Trauger/Bryant
SOCIAL SECURITY ADMINISTRATION  )


To:     The Honorable Aleta A. Trauger, District Judge


## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration") denying plaintiff's applications for disability insurance benefits and

supplemental security income, as provided under Titles II and XVI of the Social Security Act.

The case is currently pending on plaintiff's motion for judgment on the administrative record

(Docket Entry No. 12), to which defendant has responded (Docket Entry No. 15).   Upon

consideration of these papers and the transcript of the administrative record (Docket Entry

No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's

motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.


## I. Introduction

Plaintiff filed his applications for benefits in September 2011, alleging

disability onset as of December 15, 2010 (Tr. 128-41), due to missing two fingers on his left

_____

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

hand, surgery on his right wrist, arthritis, and mental illness. (Tr. 159) His applications were denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of his case by an Administrative Law Judge (ALJ). The case came to be heard by the ALJ on May 23, 2013, when plaintiff appeared with counsel and gave testimony. (Tr. 29-70) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until August 6, 2013, when she issued a written decision finding plaintiff not disabled. (Tr. 13-23) That decision contains the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since December 15, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: penile carcinoma, arthritis, hypertension, obesity, and major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can lift and/or carry 20 pounds occasionally and ten pounds frequently. He can sit for six hours in an eight-hour workday. He can never climb ladders, ropes, or scaffolds. He can perform all other postural activities on a frequent basis. He can perform no work around hazards in the workplace. He is limited to simple and repetitive one to two step tasks and instructions. He can attend to and complete such tasks and instructions for at least two hours at a time. He would perform better if shown how to accomplish a task rather than told how to accomplish a

task.  He can handle occasional change in the workplace routine, setting, or location.  He can perform no production pace or quota type work.  He has no independent decision making ability.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on March 21, 1970 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the regional and national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 15, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-17, 21-23)

        On August 9, 2014,  the Appeals Council denied plaintiff's request for review

of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the

Administration.  This civil action was thereafter timely filed, and the court has jurisdiction.

42 U.S.C. §§ 405(g), 1383(c).  If the ALJ's findings are supported by substantial evidence,

based on the record as a whole, then those findings are conclusive.  Id.

## II.  Review of the Record

The following summary of the medical evidence in this case is taken from

plaintiff's brief, Docket Entry No. 12-1 at pp. 3-13:

On the alleged onset date, Plaintiff was 40 years old. T 154. Plaintiff reported 1 year of college as highest grade of school completed. T 160. He reported past work as a laborer. T 160. Plaintiff's date last insured was December 31, 2014.1 T 154.

## A. Medical Records

On July 27, 2009, Plaintiff saw Vivek Narain, M.D., for evaluation of penile lesion and left testicular growth. T 413. Examination showed a large condylomatous growth on his left shaft, including the penile base. T 413. Left testicle had a nodular cystic density. T 413. Dr. Narain obtained the impression of a left testicular mass and penile condyloma. T 415. On January 27, 2010, Plaintiff presented to Conn McConnell, M.D., where he reported so much discomfort that it prevented sleep and brought on depression. T 263. He reported constant pain in the neck muscles as well as cluster headaches. T 263. Diminished range of motion of neck, when looking to the left, was observed. T 263.

Plaintiff presented to Dr. Narain on March 1, 2010, reporting significant left testicular pain. T 409. Scrotal ultrasound from February 19, 2010, showed cystic mass adjacent to left epididymis. T 409, 438. Upon examination, Dr. Narain observed a large condylomatous lesion in the left base of penis which Plaintiff reported to be painful to him. T 409. Dr. Narain recommended Plaintiff undergo excision of the growth in his penis as well as the cystic area in the left testicle. T 409. On March 3, 2010, Plaintiff saw Dr. McConnell complaining of cervicalgia, chronic neck pain, and hand pain. T 293. Dr. McConnell observed swollen left hand. T 293. Days later, on March 8, 2010, under the care of Dr. Narain, Plaintiff underwent a left renal cyst excision, as well as an excision of the penile mass on the left base of the penis. T 405. On April 5, 2010, he saw Dr. Narain after spermatocelectomy that showed squamous cell carcinoma with tumor. T 404. Scrotal pain improved and he reported procedural success. T 404.

On April 24, 2010, Plaintiff presented to Sumner County Health Department ("SCHD") complaining of chronic pain and swelling in right hand. T 261. Two days later, he saw nurse practitioner Kiersten Espaillat at Mental Health Cooperative ("MHC") for psychiatric evaluation. T 197-98. He complained of depression with crying spells, fatigue, lack of

motivation, social isolation, mood swings, and irritability. T 198. He also reported gaining 100 pounds in the last year and difficulty sleeping. T 198. On May 27, 2010, Plaintiff saw NP Espaillat at MHC for psychiatric evaluation where he reported that he is "still depressed." T 199. NP Espaillat started Prozac at this time. T 200. She diagnosed major depressive disorder. T 204.

On September 14, 2010, Plaintiff presented to nurse practitioner Glass of MHC for routine mental health check-up, reporting that he stopped Depakote due to somnolence. T 207. On November 12, 2010, he saw NP Glass for medication management. T 209. He reported an increase in depression and social isolation. T 209. He also reported stress and inability to stay asleep. T 209. He reported daily pain as bad and reported feelings of hopelessness. T 209. On November 24, 2010, he saw Dr. McConnell for follow-up due to bilateral hand swelling. T 264. On April 25, 2011, NP Glass saw Plaintiff for medication management where he complained of depression, irritability, social isolation, problems sleeping, and variable appetite. T 217. NP Glass restarted Prozac at this time. T 218. On September 2, 2011, he presented again for medication management where his "foul" mood and expansive affect were observed. T 243.

On September 14, 2011, Plaintiff presented for physical examination to SCHD complaining of continuous swelling, chronic pain, and arthritis. T 259-60. On October 27, 2011, he saw nurse practitioner Laura Holt at MHC for medication management where he reported continuing mood swings, irritability, anxiety, and isolation. T 298. He stated he would like to get a job but was unsure if he could handle being around people. T 298.

On the first of many occasions associated with tinea of the toenails, Plaintiff saw Dr. McConnell on November 21, 2011, complaining of painful left great toe nail, fungal infection, and curling of toenail. T 294. At this time, Dr. McConnell observed left great toe nail curled and digging into flesh. T 284. Two days later, he saw Dr. McConnell for "severe case of tinea of nails" as the left great toe nail was curled and pinching skin. T 288. The nail was removed. T 288. On November 28, 2011, Plaintiff presented for follow-up where he reported the toe was stepped on and is oozing light greenish/yellowish fluid. T 284

On December 9, 2011, Plaintiff presented to Susan Scott, R.N., at MHC for medication management where he reported needing Prozac due to increase in depression. T 301. On December 19, 2011, he saw Dr. McConnell again due to curling of toenails, reporting second toe on right foot to be quite painful. T 283. That nail was also removed. T 283. Eight days later, he saw Dr. McConnell again for tinea of nails due to curling that was biting flesh.      T 283. Dr. McConnell removed the nail after observing the large left toe curled and thickened. T 283. Then on January 3, 2012, Plaintiff presented for another toenail removal.  T 283. He

also presented to Hannah Thompson, R.N., for medication management where he reported that "things have been tough" and that depression increased. T 303.

On January 17, 2012, Plaintiff saw Dr. McConnell again due to toenail pain. T 282. One week later he had another toenail removed. T 282. On January 25, 2012, Plaintiff saw NP Holt and reported depression, lack of motivation, and lack of energy. T 305. NP Holt assessed him with passive suicidal ideation. T 305. Seroquel was discontinued and Tegretol was started. T 306. On February 7, 2012, Plaintiff saw Dr. McConnell due to tinea of nails that curl and bite into his toes, digging into his flesh. T 282. He had 5 toenails removed to date. T 282.

On February 21, 2012, Plaintiff saw psychiatrist Thomas Lavie, M.D., where Plaintiff reported irritability, anxiety, and poor sleep with Tegretol. T 308. It was noted that Seroquel was restarted the previous Friday with improvement in moods, but that Plaintiff continues to report depression and irritability. T 308. Plaintiff had passive suicidal ideation. T 308. Dr.Lavie diagnosed major depressive disorder and bipolar disorder. T 308. Plaintiff reported Tegretol made him dizzy and nauseous. T 309. Dr. Lavie discontinued Tegretol, increased Prozac, and started prescriptions Vistaril and Seroquel. T 309.

On May 18, 2012, he saw Dr. McConnell following an emergency room visit. T 281. At this time he also complained of pain in left fifth digit of hand. T 281. On the same day, Plaintiff saw Dr. Lavie where he reported having a panic attack and going to the emergency room. T 312. Plaintiff requested another Valium prescription. T 312. Dr. Lavie continued Prozac, discontinued Seroquel, and started Tegretol. T 313. On June 1, 2012, Plaintiff saw Dr. McConnell because tinea of nails caused pain walking. T 281.

On August 10, 2012, Plaintiff saw psychiatric nurse practitioner Dena Wampler, R.N., at MHC for medication management. T 321. He reported continuing anxiety, panic attacks, depression, and mood swings. T 321. On September 22, 2012, Plaintiff presented to Dr. Narain with penile skin lesions. T 398. Five days later, he saw Dr. Narain again who diagnosed cancer of penile skin. T 397. On September 28, 2012, Plaintiff saw RN Wampler for medication management. T 337. In the medical assessment notes, an unnamed doctor noted that Plaintiff's mood is "worse" because he found out he is facing a penectomy due to penile cancer that spread into the lymph nodes. T 337. The cancer has been causing him a great deal of anxiety and sadness. T 337. Clonazepam was prescribed. T 337.

On October 9, 2012, Plaintiff saw urologist Sriram Dasari, M.D., presenting with multiple skin lesions. T 390. Pain and increasing size associated with the lesions was noted. T 390. It was noted that Plaintiff had a penile mass excision in 2010. T 390. Plaintiff underwent

another excision of penile mass and reconstruction at the hands of Dr. Dasari, due to penile mass on the left side of the penile shaft. T 425. Augmentin was started at this time. T 390. Then, Plaintiff called Dr. Dasari's office on October 13, 2012, complaining of frequent urination and urinary burning. T 389. He saw Dr. Dasari for a post-operative follow-up on the same day, reporting significant swelling in the penile area. T 386. Dr. Dasari discussed placing a catheter but decided against it on this date. T 386. Ten days later, Plaintiff saw Dr. Dasari for postoperative follow-up where symptoms were characterized as worsening. T 378. Plaintiff reported severe pain. T 378. Significant swelling in penile area was observed. T 378. The next day, he presented again with pain in the penile area. T 382. Examination showed significant swelling and Dr. Dasari placed a catheter at this time. T 382.

On November 2, 2012, Plaintiff saw RN Wampler for medication management where he reported having the first part of his surgery due to penile cancer and reported experiencing extreme pain. T 341. On December 7, 2012, he again presented for medication management. T 348. On November 9, 2012, Plaintiff presented to Dr. Dasari for post-operative follow-up. T 374. Symptoms were described as worse, and he reported severe post-operative pain. T 374.
Dr. Dasari observed significant swelling in his penile area. T 374. Dr. Dasari prescribed Percocet for pain. T 375. On February 1, 2013, Plaintiff saw RN Wampler for medication management where he complained of continuing anxiety. T 358. Mood was observed as poor with tearful affect. T 359.

On August 26, 2013, NP Wampler of the MHC issued a letter explaining Plaintiff's medical treatment history and associated limitations. T 454. She described herself as Plaintiff's provider from May of 2012 onward. T 454. She stated that Plaintiff has "generalized anxiety and suffers from panic attacks when he is around people and in unfamiliar situations." T 454. She noted his series of jobs which resulted in terminations because of his agitation and anxiety. T 454. She noted that he has made every attempt to try to get treated at the clinic, despite having to live out of state due to homelessness, and that he remains consistent on medication. T 454.

NP Wampler rendered an opinion of limitations on August 26, 2013. T 455-57. She noted the following as Plaintiff's signs and symptoms: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; sleep disturbance; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; generalized persistent anxiety; apprehensive expectation; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. T 455. She opined to the following general limitations caused by Plaintiff's psychological condition: extreme

restriction of activities of daily living; extreme difficulty in maintaining social functioning; deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner are present; repeated episodes of deterioration or decompensation in work or work-like settings which cause the patient to withdraw from the situation or experience exacerbation of signs and symptoms are present. T 456. She opined that Plaintiff is moderately impaired in the following categories: ability to remember locations and work-like procedures; ability to understand and remember short and simple instructions; ability to carry out very short and simple instructions; ability to make simple work-related decisions. T 456. She opined to marked limitations in the following categories: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination with and proximity with others without being distracted by them; ability to interact appropriately with the general public; ability to ask simple questions or request assistance; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting; ability to travel in unfamiliar places or use public transportation; ability to set realistic goals or make plans independent of others.      T 456- 57. NP Wampler opined to extreme impairments in the following categories: ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors. T 456-57. She noted 55 as the highest global assessment functioning ("GAF") in the last 12 months and 46 as the lowest. T 457. She related these findings back to May of 2012. T 457. She included in her comments that Plaintiff's symptoms of anxiety, panic attacks, feelings of worthlessness and hopelessness, and low energy are due to major depressive disorder and exacerbated by many physical ailments. T 457. On January 7, 2014, NP Wampler issued another medical source statement concerning psychological impairments. T 461-63.

### B. Plaintiff's Hearing Testimony

Plaintiff testified to the following: He was let go from Holleman Trucking because he "just couldn't…perform what [he] was supposed to do" despite the accommodations that were provided. T 38. He weighs 350 pounds. T 39. He is right handed. T 40. He has not gone to church for about 10 months because of anxiety issues. T 42. He has "physical limitations with [his] hands…[he has] lost fingers." T 42. He had surgery on his hand[s] and it swells. T 42. He "hurt [his] neck in prior injuries" and has lower back issues. T 42. He has mental issues including "real bad" anxiety, bipolar disorder, and depression. T 42. He has had two surgeries due to penile cancer, which causes constant pain, and he requires two more surgeries. T 43.

The pain is "unbearable at times sitting [and] standing." T 43. He has to stand due to discomfort from sitting after 20 to 30 minutes. T 45. He cannot walk a block because of "arthritis in [his] feet." T 46. He experiences pain in his "hands, arms, wrists, [] neck, [and] [] lower back." T 48. He "lost all [his] nails…to diabetes." T 48. He is "missing a couple fingers and…[he has] ripped [a] tendon before all the way back so they've cut [him] from the tip of [his] thumb…all the way down [his] arm and tried to reattach tendons." T 48. The "arthritis is just unbearable." T 48. He was diagnosed with rheumatoid arthritis by a health department doctor based on blood testing. T 48.

He cannot take a whole "wet load" out of the washer because he "can't even lift a whole load out" when attempting to do laundry. T 49. He does not help with any of the chores around the house. T 49. He went to a vocational rehabilitation class when he was unemployed in 2011 and did not receive any job offers. T 51. When he presents for appointments, "sometimes [he] just see[s] the nurse…[he] do[esn't] even see the doctor." T 53. He would "like to see the doctor." T 53.

He experiences more pain in his right hands and wrists. T 53. He can do work with his arms and hands for 15 minutes before "they fall asleep and tingle real bad [with] sharp pain." T 54. He can work with his hands for a couple of hours in an 8-hour workday. T 54. He can lift and carry 8 pounds at most and four or five pounds frequently. T 55. He can stand for about 15 to 20 minutes before having to sit down to rest. T 55. He could stand for two to three hours in an 8-hour workday. T 55. He can sit for 15 to 20 minutes before having to stand to stretch. T 55. He can sit for a couple of hours total in an 8-hour workday. T 55-56. His pain is a seven or eight on a one to ten scale with medications. T 56. A couple of times a month he gets cluster migraines that are unbearable, causing vision loss and tunnel vision, and lasting two or three days. T 56-57. He has post-surgery pain in the penile region. T 57. It "[h]urts to sit[,]" "going to the bathroom hurts, going to urinate hurts." T 57-58. His mental health medications cause fatigue. T 58. His pain medications also cause fatigue and some dizziness. T 58-59. He cannot be around groups of people because of his anxiety. T 59. His anxiety symptoms include shortness of breath, sweating, and an ice cold feeling while burning up inside. T 59. He has trouble remembering things. T 60. He cannot follow written instructions. T 60. He "get[s] angry" when receiving criticism. T 61. He does not handle change well. T 62.

## C. Vocational Expert's Testimony

The vocational expert ("VE") testified that a hypothetical person with the same age, education, and experience as the Plaintiff, with the following limitations would be able to perform other jobs in the national economy: lift or carry 20 pounds on occasion and 10

frequently; sit six hours total; stand or walk four hours total; never climb ladders, ropes, or scaffolding; cannot work around hazards in the workplace including unprotected heights or moving machinery; limited to simple, repetitive one to two step tasks and instructions; can attend to and complete such tasks and instructions for periods of at least two hours at a time; he would be better if shown how to do a task rather than told; he can handle occasional to infrequent changes in the workplace routine, setting, or location; cannot perform production pace or quota type work and should perform no independent decision making abilities. T 63-64.

To the second hypothetical question, including the limitations in the first hypothetical as well as the following limitations, the VE testified that no work would exist in the national economy: due to pain or fatigue, this person would need to either lie down or rest as needed during the day; this would occur during times other than normal scheduled breaks. T 65.

The VE testified to a third hypothetical given by Plaintiff's attorney that a person with the same age, education, and experience as the Plaintiff, with the following limitations would be unable to perform any work: that individual would be limited to lifting 10 pounds occasionally, no pounds on a frequent basis; he could stand four 30 minute increments throughout an eight hour workday and sit for 15 minute increments but sitting would be limited to a total of one hour; would never be allowed to stoop; do any manipulation, fine or gross bilaterally; or work around dangerous equipment and only occasionally bend, balance; tolerate heat or cold; he would frequently need time during the eight hour workday to elevate his legs or take rest periods; that individual would miss four or more days of work per month. T 65-66.

### III.  Conclusions of Law

#### A.  Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied.  Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003).  "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the record contains substantial evidence that could have supported an opposite conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case de novo, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational

11

factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the

analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

## C. Plaintiff's Statement of Errors

Plaintiff first argues that the Appeals Council erred by failing to remand the matter to the ALJ after considering the new and material evidence which plaintiff submitted after the ALJ's decision was rendered, i.e., the two medical source statements from Nurse Practitioner Wampler.  Proceeding with his argument, plaintiff appears to recognize that the new evidence cannot be considered by this Court in its substantive review of the denial of his benefits claim.  (Docket Entry No. 12-1 at 14) (quoting Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001)).  Nonetheless, plaintiff seeks judgment "pursuant to Sentence Six of 42 U.S.C. § 405(g), that the Commissioner's decision be vacated and that this matter be remanded for further administrative proceedings, including de novo hearing."  (Docket Entry No. 12-1 at 27)  Alternatively, plaintiff seeks this same relief under the fourth sentence of § 405(g).  Id.

As noted above, it is the ALJ's decision which is the subject of review here, as hers became the "final decision of the Commissioner of Social Security" once the Appeals Council declined review in the case.  See 42 U.S.C. § 405(g).  Accordingly, error on the part of the Appeals Council is not properly alleged in this case, nor may the court properly consider evidence that was submitted for the first time before the Appeals Council in deciding whether to affirm, modify, or reverse the ALJ's decision under the fourth sentence of  § 405(g).  See, e.g., Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996); see also

<u>Cooper v. Comm'r of Soc. Sec.</u>, 277 F.Supp.2d 748, 753-54 (E.D. Mich. 2003). Rather, it is the

*prejudgment* remand authorized by the sixth sentence of § 405(g) that provides plaintiff's

only remedy in seeking to have the "new" evidence considered in support of his current

claim. <u>See</u> <u>Cooper</u>, <u>supra</u>. The undersigned construes plaintiff's motion as requesting such a

remand.

        Sentence six of § 405(g) authorizes the court to order a return to the agency

for the ALJ to consider evidence that was not previously before her, "but only upon a

showing that there is new evidence which is material and that there is good cause for failure

to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The

party seeking remand bears the burden of demonstrating newness, materiality, and good

cause. <u>Hollon v. Comm'r of Soc. Sec.</u>, 447 F.3d 477, 483 (6th Cir. 2006). The evidence in

question here is clearly new, as it was not in existence at the time of plaintiff's hearing or the

ALJ's decision. <u>See</u> <u>id.</u> at 483-84 (<u>quoting</u> <u>Foster v. Halter</u>, 279 F.3d 348, 357 (6th Cir. 2001)).

"Such evidence, in turn, is deemed 'material' if 'there is a reasonable probability that the

[Commissioner] would have reached a different disposition of the disability claim if

presented with the new evidence.'" <u>Id.</u> It is not sufficient to establish the mere potential for

materiality. The new evidence must be probative of the severity of plaintiff's impairments,

greater than previously demonstrated, during the period considered by the ALJ; evidence

which establishes only that the same impairments worsened in severity after the hearing is

not material for these purposes. <u>E.g.</u>, <u>Jones v. Comm'r of Soc. Sec.</u>, 336 F.3d 469, 478 (6th Cir.

2003). Finally, good cause for the failure to incorporate the new evidence into the record

before the ALJ must be shown. The Sixth Circuit takes a "harder line" on the good cause

test, requiring a "valid reason" for not procuring and submitting evidence prior to the ALJ

hearing.  <u>Oliver v. Sec'y of Health & Human Servs.</u>, 804 F.2d 964, 966 (6th Cir. 1986) (citing

<u>Willis v. Sec'y of Health & Human Servs.</u>, 727 F.2d 551, 554 (6th Cir. 1984)).  That the

evidence did not theretofore exist and so could not have been submitted for the ALJ's

consideration will not alone establish good cause.  <u>Id</u>.

   In the case at bar, the two medical source statements from Nurse Wampler do

not appear to satisfy the standard for materiality.  As plaintiff observes, though Nurse

Wampler has provided mental health treatment (albeit only six times according to plaintiff),

she is not an "acceptable medical source" whose opinion may be accorded the preference

established under the regulations for a treating psychiatrist or psychologist.  20 C.F.R. §

404.1513(a), (d).  Rather, Nurse Wampler is an "other source" whose opinions are deserving

of  consideration, but are not overly compelling as evidence creating a reasonable probability

of altering the outcome in this case.  <u>Beaty v. Comm'r of Soc. Sec.</u>, 2012 WL 3779700, at *8

(W.D. Mich. Aug. 3, 2012).  Moreover, plaintiff has made no showing at all of good cause,

but simply adverts to the newness of the evidence, citing <u>Fazio v. Heckler</u>, 750 F.2d 541 (6th

Cir. 1984), and the decision cited therein, <u>Wilson v. Sec'y of Health & Human Servs.</u>, 733

F.2d 1181 (6th Cir. 1984), as authority for the proposition that the unavailability of evidence

at the time of hearing is sufficient to establish good cause.  However, <u>Fazio</u> involved a denial

decision that was based on the insufficient evidence of an impairment's duration for more

than a year in an infant who was not yet one year old at the time of the ALJ hearing, and the

new evidence, adduced after the infant's first birthday, established the impairment's duration

beyond a year -- a frank impossibility prior to that point.  As for <u>Wilson</u>, the panel in that

case found good cause because the new medical records had been generated after the

hearing, and so "could not have been introduced there," citing the Ninth Circuit's decisions

in <u>Ward v. Schweiker</u>, 686 F.2d 762, 764 (9th Cir. 1982), and a case cited therein, <u>Georg v. Schweiker</u>, 643 F.2d 582, 584 (9th Cir. 1981). However, relying on its own precedent which predated both <u>Fazio</u> and <u>Wilson</u>, the Sixth Circuit in <u>Oliver</u> found that "[w]hile the dates on the reports alone seemingly satisfied the good cause test in <u>Ward v. Schweiker</u>, 686 F.2d 762, 764 (9th Cir. 1982), this circuit has taken a harder line on the good cause test." 804 F.2d at 966 (citing <u>Willis v. Sec'y of Health & Human Servs.</u>, 727 F.2d 551, 554 (6th Cir. 1984)). In short, the mere newness of the evidence offered by plaintiff here does not suffice to establish good cause. The request for remand pursuant to the sixth sentence of 42 U.S.C. § 405(g) should be denied.

Regarding the extent to which the ALJ's findings are supported by substantial evidence, plaintiff raises four arguments, two of which involve the allegedly severe impairment of the loss of two fingertips on plaintiff's left hand. Plaintiff claims error in the ALJ's finding that this impairment is not severe, and the subsequent failure to include any limitations resulting from it in the hypothetical presented to the vocational expert. The ALJ gave specific attention to this allegedly severe impairment, finding support for its non-severity in "the fact that the claimant was able to care for his elderly mother, cares for his son, and worked full time following the loss of the tips of the two fingers on his left hand - furthermore the claimant testified that he is right handed." (Tr. 16) Defendant points out that the injury to these fingers occurred in 1989, as a result of a motorcycle accident. (Tr. 448) Although plaintiff points out that the jobs which the vocational expert identified require both handling and fingering on at least an occasional basis (Docket Entry No. 12-1 at 26-27), defendant points out that plaintiff's past work which was performed after suffering the injury also required frequent carrying, handling, and fingering. (Docket Entry No. 15 at

12) In any case, the undersigned finds that the ALJ adequately accounted for this remote injury to plaintiff's non-dominant hand, and that her finding that the impairment is non-severe is supported by substantial evidence.

Plaintiff argues that the ALJ's finding of his RFC is not supported by substantial evidence because it does not adequately account for his mental limitations, his catheterization in October 2012, his loss of fingertips, or his tinea of toenails. As to his mental RFC, after reviewing the evidence of plaintiff's treatment at the Mental Health Cooperative, the ALJ found as follows:

> Regarding the claimant's mental limitations, socially, although the claimant reported not being able to be around people, he had friends he could depend on and lived with, he had a girlfriend for part of the relevant period, and he lived with his mother, who drove with him to the hearing. He admitted that he was "just not motivated." Regarding activities of daily living, he admitted that he was actively seeking employment. He took care of his son for at least part of the relevant period. Regarding concentration, persistence, or pace, he could drive, he testified he sometimes prepared his own meals, and the undersigned notes that he drove and rode for nine hours to the hearing. His mental status examinations from Mental Health Cooperative, though cursory, were generally unremarkable. The claimant's GAF of 40 is given little weight, as it was a snapshot of the claimant's condition at that time, GAFs are not standardized scores and do not predict outcomes, and it is inconsistent with the record as a whole, and the diagnosis of "moderate" major depressive disorder. The undersigned notes that the claimant did not provide a Function Report. There were no functional opinions (other than the GAF) in the record. Overall, the record does not support more limitations than what are given above. ... The claimant was limited to simple repetitive work with additional limitations, which correctly accounts for the claimant's mental impairment of depression.

(Tr. 21) The "additional limitations" which were included in the RFC finding were:

> He can attend to and complete [one to two step] tasks and instructions for at

least two hours at a time.  He would perform better if shown how to accomplish a task rather than told how to accomplish a task.  He can handle occasional change in the workplace routine, setting, or location.  He can perform no production pace or quota type work.  He has no independent decision making ability.

(Tr. 17)  While plaintiff has been diagnosed with anxiety in the past, the mere diagnosis of a condition says nothing of its severity.  Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988).  In any event, the undersigned finds that the ALJ's allowance for only occasional change in routine and no production-pace work fairly considers the effects of plaintiff's anxiety symptoms, and that her RFC finding as it pertains to plaintiff's work-related mental limitations is supported by substantial evidence.

Plaintiff contends that the RFC determination failed to adequately account for the effects of his catheterization on October 23, 2012.  However, defendant points out that the record reveals that the catheter was actually placed by Dr. Dasari on October 17, 2012 (Tr. 382) and then removed on the October 23, 2012.  (Tr. 378)  There is no indication that a catheter was in place beyond this period.  This argument is without merit.

As to plaintiff's difficulties with  fungal infection (tinea) of his toenails and ingrown toenails which required nail removal, the parties agree that plaintiff's first report of such difficulties was in November 2011, while his last such complaint noted in the record was in September 2012 (Tr. 280-88).  (Docket Entry No. 12-1 at 24; Docket Entry No. 15 at 18)  Plaintiff has not pointed to any other medical or testimonial evidence which would support a more protracted period of time during which he experienced limitations owing to ingrown or infected toenails.  Thus, any such impairment fails to meet the 12-month duration requirement for consideration under the Social Security Act.  42 U.S.C. §

423(d)(1)(A).

Finally, plaintiff contends that the ALJ erred in failing to adequately support her determination that plaintiff's claim to disability was not entirely credible. Specifically, plaintiff asserts that the ALJ failed to consider the fact that he had attended a vocational rehabilitation course in an attempt to find a job, an effort which should bolster his credibility. More generally, plaintiff argues that the ALJ's credibility finding was not supported by adequate reasoning, but was rendered in a single, conclusory statement (citing Tr. 18) and thus cannot be meaningfully reviewed under the substantial evidence standard. However, the single, conclusory statement highlighted by plaintiff followed the ALJ's synopsis of his hearing testimony, and is merely the introduction to the ALJ's weighing of the evidence. After detailing the medical and other evidence that informed her decision (Tr. 18-20), the ALJ offered a thorough analysis of the credibility of his complaints related to mental impairments (Tr. 21),[2] as well as the following analysis of the credibility of his physical complaints:

> Regarding the claimant's physical limitations, he was not treated during the relevant period until September 2011. Until September 2012, his doctor visits were largely for him to get his toenails removed. There were very few visits regarding back pain or joint pain, and the claimant was generally treated with Ibuprofen. He was diagnosed with malignant hypertension, but there was nothing in the record showing what limitations he had from this. In September 2012, the claimant again underwent an ordeal due to penile cancer. However, the undersigned notes that, although the claimant stated he could sit for only 20 to 30 minutes at a time, he testified that he drove and rode for nine hours from near St. Louis, MO to Nashville, TN with his mother in order to appear at the hearing. Further, while not dispositive of this decision, the claimant admitted to looking for work. Overall, the record simply does not

[2]Reproduced *supra* at 17.

support the limitations that the claimant alleged, and supports no more limitations than what are given above. There are no presented objective or medical opinions on the record concerning the claimant's physical limitations.

(Tr. 20-21) Even if the ALJ could have construed plaintiff's efforts to secure employment as a factor in support of his credibility, rather than an indication that considered himself able to work, the undersigned finds that the ALJ's credibility determination is sufficiently reasoned and supported by substantial evidence.

The ALJ properly considered the evidence of credible limitations from plaintiff's combined mental and physical impairments, and propounded a hypothetical question to the vocational expert that took account of such credible limitations. Therefore, the ALJ was entitled to rely on the expert's testimony to the existence of jobs in the economy which would accommodate those limitations. <u>Keeton v. Comm'r of Soc. Sec.</u>, 583 Fed. Appx. 515, 533 (6th Cir. Oct. 14, 2014). The resulting decision that plaintiff is not disabled is supported by substantial evidence and should be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections

filed in which to file any responses to said objections. Failure to file specific objections

within fourteen (14) days of receipt of this Report and Recommendation can constitute a

waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985);

<u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).


   **ENTERED** this 29th day of February, 2016.



      s/ John S. Bryant      

     JOHN S. BRYANT

     UNITED STATES MAGISTRATE JUDGE